IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KRISTOPHER KEALOHA, | ) | Civ. No. 05-00009 ACK-KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF PUBLIC SAFETY OF | ) | |
| THE STATE OF HAWAII and LEE | ) | |
| FIELDS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

Kristopher Kealoha brought this action against the
Department of Public Safety of the State of Hawaii and Lee
Fields.  In light of the Order Granting in Part and Denying in
Part Defendants' Motion for Summary Judgment (Jul. 20, 2006), the
claims remaining for trial are: (1) Section 1983 claim for
violation of the Eighth Amendment's prohibition against cruel and
unusual punishment, against Fields in his individual capacity;
(2) violation of Hawaii Constitution Article I, Section 12,
against the Department of Public Safety and Fields in his
individual capacity; and (3) negligence, against the Department
of Public Safety and Fields in his individual capacity.  Fields
asserts qualified immunity from all claims.

The Court held a nonjury trial on April 17-18, 2007.
The Court enters the following findings of fact, conclusions of

law, and decision.  Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

## I.   Findings of Fact

1.   Kristopher Kealoha ("Plaintiff" or "Kealoha") is currently an inmate at Halawa Correctional Facility ("Halawa") and was an inmate at Halawa during the relevant time frame in November - December 2002.

2.   Halawa is administered by the Department of Public Safety of the State of Hawaii ("DPS").

3.   Sargent Lee Fields is, and was during the relevant time frame in November - December 2002, an Adult Correctional Officer employed by DPS at Halawa.  Sgt. Fields is, and was then, an officer of the Gang Intelligence Unit at Halawa.

4.   At all relevant time periods, Sgt. Fields did not have the authority to make or change inmate housing assignments himself, but could make housing recommendations to the Deputy Warden or other staff members who had authority to make housing assignments.

5.   At all relevant time periods, Eric Tanaka was the Deputy Warden at Halawa.  When making housing assignments, Tanaka would not rubberstamp a recommendation by a Gang Intelligence Unit officer.  Before making a housing assignment, Tanaka would consult with other staff as well, including personnel from case

management, medical, mental health, and social work, check the
inmate's record, and look at adjustment hearing results.

6.   Kealoha was previously housed in a prison facility in
Florence, Arizona, where he joined the USO Family gang.  He
obtained a gang identifying tattoo on his right upper arm while
in the Florence facility in 2000, consisting of the letters U-S-
O.

7.   In approximately December 2001, while housed at Halawa,
Kealoha withdrew from the USO Family gang.

8.   When a gang member leaves a gang, if that former member
has a gang identifying tattoo, he is asked to cover the tattoo.
The gang tattoo is usually covered by a new tattoo.  If the
former member does not cover the gang tattoo, he is subject to
being disciplined by gang members.  Sgt. Fields was aware of
these facts.  Sgt. Fields has never heard of an inmate at Halawa
being killed for leaving a gang, nor (Plaintiff's allegations
aside) of a gang tattoo being forcefully removed or burned off.

9.   In early November 2002, Kealoha was housed in Module A
of the high security special needs facility (the "High") at
Halawa.[1/]  Kealoha was aware of no USO Family gang members in his
module (High Module A).

10.   On approximately November 13, 2002, Kealoha was

_____

[1/]Kealoha was placed into High Module A shortly after he
escaped from the minimum security Waiawa Correctional Facility
and was recaptured.

3

transferred to Module 2 of the medium security facility (the "Medium") at Halawa.

11.   On November 15, 2002, while in Medium Module 2, Kealoha passed a note to a correctional officer that read: "MY <u>LIFE</u> IS IN DANGER[.]  THEY GONNA KILL ME[.]  TAKE ME OUT OF HERE NOW[.]" <u>See</u> Exhibit 3.

12.   Shortly thereafter, Kealoha was interviewed by a correctional officer (Sgt. Kon).  In the interview, Kealoha stated that he had been in the USO Family gang but had withdrawn from the gang, and that the USO Family gang members were not happy about his withdrawal and were now waiting for an opportunity to kill him.  <u>See</u> Exhibit 3.  Kealoha was removed from Medium Module 2 and placed into Special Holding in Medium. <u>Id.</u>

13.   While in Special Holding, between November 15 and November 22, 2002, Kealoha met with Sgt. Fields approximately two times.  Kealoha informed Sgt. Fields that Kealoha felt that his life was in danger in Medium Module 2 by members of the USO Family gang.  Kealoha requested to be housed in High Module A because he said he felt safe there.

14.   Sgt. Fields asked Kealoha if he wanted to go into protective custody.  Kealoha declined.

15.   Sgt. Fields suggested to Kealoha that Kealoha be housed in Medium Module 1A.  Sgt. Fields testified credibly as to this

fact, even though it is not reflected in his report dated January 29, 2003; Kealoha's testimony does not dispute this fact.

16.   Medium Module 1 (which includes Medium Module 1A) generally had little drug activity, assaults, or incident reports - unlike Medium Module 2, which was a more rough module.  Deputy Warden Tanaka and Sgt. Fields both testified credibly to these facts; Kealoha did not dispute these facts or offer any evidence that Medium Module 1A was a rough module, other than Kealoha's testimony about the alleged assault that he suffered in Module 1A.  In viewing the demeanor of the witnesses, their testimony and responses to questions, the Court finds overall that Sgt. Fields and Deputy Warden Tanaka were credible witnesses and that Kealoha's testimony generally lacked credibility.

17.   In early November 2002, there were two USO Family gang members housed in Medium Module 1A, Quad 4: Gilbert Rivera and Eddie Leiato.  <u>See</u> Exhibit 114.  Sgt. Fields was aware that these two USO Family gang members were housed in Medium Module 1A, as well as members of other gangs, including LaFamilia and Mafia USO.  <u>See</u> <u>infra</u> Finding of Fact ¶ 27.

18.   During the meetings between Kealoha and Sgt. Fields between approximately November 15, 2002 and November 22, 2002, Sgt. Fields informed Kealoha that Medium Module 1 had little drug activity, assaults, or incident reports and was less rough than Medium Module 2.

19.   During these meetings, Sgt. Fields informed Kealoha that a small number of USO Family gang members were housed in Medium Module 1A.  See infra Finding of Fact ¶ 27.

20.   During the meetings between Kealoha and Sgt. Fields between approximately November 15, 2002 and November 22, 2002, Kealoha informed Sgt. Fields that Kealoha's father was scheduled to be reassigned from the High to the Medium, and that Kealoha would like to be housed in the same module as his father. Kealoha indicated that he feared for his father's safety in Medium Module 2.  See Exhibit 14.  Sgt. Fields told Kealoha that he would recommend that both Kealoha and his father be reassigned to Medium Module 1A.

21.   On November 22, 2002, after the meetings between Kealoha and Sgt. Fields that took place between approximately November 15, 2002 and November 22, 2002, Sgt. Fields and Kealoha both understood that they were in agreement that Kealoha should be reassigned to Medium Module 1A.  Sgt. Fields recommended to Deputy Warden Tanaka that Kealoha be reassigned to Medium Module 1A.

22.   On November 22, 2007, while still in Special Holding, Kealoha submitted two requests: a Segregation Action Request and a Separatee Request.

23.   The Segregation Action Request stated "I fear the USO family that they will roll me up.  I feel safe in module 1

because I am in with the Mafia USO.  I do not want protective custody."  Exhibit 4.[2/]  The Segregation Action Request requested suspension of assignment to Protective Custody segregation effective November 22, 2002.  Id.[3/]

24.  The Separatee Request stated: "I fear that the USO family will roll-me-up because I did not participate in the riot that happened in the mainland."  Exhibit 5 at HCF0018.  The request explicitly requested separatee status from two inmates: Roman Maave and Justin Agustin, for fear that each "will kill me."  Id. at HCF0019.  The Separatee Request did not specifically request separatee status from any inmate housed in Medium Module 1A.[4/]

25.  On November 22, 2002, Kealoha was transferred to Medium Module 1A, Quad 4.  Deputy Warden Eric Tanaka was responsible for the transfer.[5/]  Tanaka felt that housing in Medium Module 1A

---

[2/]When an inmate is "rolled up," that inmate is assaulted.

[3/]On December 9, 2002, Deputy Warden Tanaka wrote that the "statement of action taken" was that Kealoha was "not recommended for P.C." and signed the Segregation Action Request as the facility administrator.  No evidence explained the delay in Tanaka's signature.

[4/]On December 6, 2002, Deputy Warden Tanaka wrote the "statement of action taken" as "Okay" and signed the Separatee Request as the facility administrator.  No evidence explained the delay in Tanaka's signature.

[5/]Sgt. Fields had recommended to Tanaka that Kealoha be transferred to Medium Module 1A; however, Sgt. Fields was not aware on November 22, 2002 that Kealoha was in fact transferred.
(continued...)

7

would not be a problem for Kealoha.  At that time, Tanaka was not aware that two USO Family gang members were housed in Medium Module 1A; nor did Tanaka understand Kealoha to be requesting segregation from all USO Family gang members.

26.  On November 22, 2002, Kealoha's father was not housed in Medium Module 1A, although he was transferred to that module days later.

27.  At no time did Sgt. Fields tell Kealoha that no USO Family gang members were housed in Medium Module 1A.  The testimony of Sgt. Fields and Kealoha differ on this point. Kealoha testified that he agreed to be housed in Medium Module 1A because Sgt. Fields guaranteed to him that no USO Family gang members were housed there.  However, Sgt. Fields' testimony is more credible on this point.  First, as a Gang Intelligence Unit officer, Sgt. Fields knew that there were two USO Family gang members housed in Medium Module 1A.  Sgt. Fields' testimony, as well as the housing sheet and Sgt. Fields' specific testimony about the housing sheet, support this finding that Sgt. Fields knew two USO Family gang members were housed in Medium Module 1A, Quad 4.  Second, Sgt. Fields had no motivation to lie to Kealoha about the gang members' housing.  To the contrary, one of Sgt. Fields' objectives in the Gang Intelligence Unit is to reduce

---

[5]/(...continued)
<u>See</u> Exhibit 14.

gang violence in the prison, not to recommend housing situations
that would create more gang violence.  Third, Kealoha's own
Segregation Action Request, which he signed and which he
testified accurately reflects what he told Boyles (the person
helping him fill out the form), explicitly states that he would
"feel safe in module 1 because [he is] in with the Mafia USO," a
rival gang to the USO Family.  <u>See</u> Exhibit 4.  It makes sense for
Kealoha to agree to go to a module with little violence, which
houses two USO Family members, but which also houses members of a
rival gang that Kealoha is "in with."  Presumably, Kealoha felt
that the Mafia USO members would protect him from the USO Family
members in Medium Module 1A.  Fourth, Kealoha wanted to be housed
with his father, who was being moved from the High to the Medium.
The parties agree that Sgt. Fields told Kealoha that Sgt. Fields
would recommend that Kealoha's father be transferred to Medium
Module 1A with Kealoha.  Again, it would make sense for Kealoha
to agree to go to a module with little violence that housed two
USO Family members if Kealoha expected his father to be there to
watch his back.  Fifth, the incredibility of Kealoha's testimony
relating to the alleged assault and burn injury, as discussed
<u>infra</u> at Findings of Fact ¶¶ 31-32 and 36-37, lessens Kealoha's
credibility as to this fact as well.

        28.  The morning of November 23, 2002, Kealoha approached
two correctional officers who were investigating a report that a

"haole guy[] got bus' up" in Medium Module 1A, Quad 4.  <u>See</u>

Exhibit 6.  Kealoha told the officers that he thought things were

cool, but that they were not.  <u>Id.</u>  When the officers asked if

Kealoha was the one who was assaulted, according to Kealoha's

testimony at trial, he "said no" and told them "it's alright;"

Kealoha did not tell them that he was assaulted or burned.

Kealoha requested to be returned to Special Holding.  He was sent

to the medical unit, where he refused any treatment,[6] and then

on to Special Holding.

29.  On November 25, 2002, Kealoha was admitted to the

Infirmary for suicide watch.  <u>See</u> Exhibit 144.[7]

30.  Sgt. Fields visited Kealoha in the Infirmary.  Kealoha

did not inform Sgt. Fields of any assault or burn.  <u>See</u> Exhibit

14.

31.  At some time prior to his admittance to the Infirmary

on November 25, 2002, Kealoha obtained new tattoo markings on his

right upper arm.[8]  Kealoha did not have a recent burn on his

---

[6]According to Kealoha's testimony, he refused to tell the
nurse what had happened, but he did show the nurse his arm.  In a
letter dated December 29, 2007, Kealoha elaborated that he
"refused treatment" at the Infirmary because they wanted him to
make a statement.  <u>See</u> Exhibit 154 at 2.

[7]Of note, Kealoha had attempted suicide on prior
occasion(s).

[8]Although tattooing instruments are contraband at Halawa,
inmates frequently obtain tattoos.  The medical staff frequently
treat fresh tattoos for infection.

right upper arm at the time of his admittance.  These facts are strongly supported by the medical records, which reflect that at the time of his admittance to the Infirmary, Kealoha had "several" "(fresh tattoo) lesions" on his right upper arm from which there was yellow drainage.  <u>See</u> Exhibit 144 at HCF0099. The medical records over the next week are consistent with a fresh tattoo.  For example, later the same day, the medical records describe the "tatoo [sic] site" on the right upper arm as draining a small amount of think yellow liquid at various sites. <u>Id.</u> at HCF00100.  The next day, the medical records indicate that Kealoha "asked for dressing supplies for [right] upper arm infected tattoo site."  <u>Id.</u>  On November 28, the medical notes state that the right "arm tattoo lesion drying out" with no drainage.  Additionally, Dr. Kay Bauman credibly testified that the notes contained in the medical chart for the period from November 25 to December 1, 2002 unquestionably indicate a mildly infected tattoo area and not a burn.[9]  The medical records and

_____

[9]The letter that Dr. Bauman wrote in response to Kealoha on February 10, 2003 does not meaningfully detract from Dr. Bauman's testimony.  <u>See</u> Exhibit 31.  While Dr. Bauman described the injury as a burn in that letter, she testified that use of the term "burn" was a mistake.  Without being provided a copy of the original letter written by Kealoha, Dr. Bauman testified that she frequently responds to patients in the same terms they use, so that if Kealoha's letter had used the term burn, that would explain why Dr. Bauman responded by using the term burn. Kealoha's letter did in fact describe his injury as a burn.  <u>See</u> Exhibit 154 at 4.  The Court finds that Dr. Bauman used the term burn carelessly in her February 10, 2003 letter; however, her
(continued...)

Dr. Bauman's testimony strongly outweigh Kealoha's self-serving testimony on this subject.

32.   Kealoha's testimony regarding being assaulted and burned on November 24, 2002 in Medium Module 1A are further undermined by his changing description of the alleged events. For example, at trial he testified that he was in Medium Module 1A overnight before realizing that any USO Family members were housed in that module.  However, in a letter written on December 29, 2007, Kealoha stated that he "immediately saw two members of the USO Family" gang when he walked into Medium Module 1A on November 22, 2002.  See Exhibit 154.  When asked about this discrepancy, Kealoha stated that he lied in the letter. Similarly, at trial Kealoha testified that he lost consciousness when he was assaulted - that he was "knocked out" and then "woke up" to find that he was being burned; however, Kealoha told the police that he only "almost" lost consciousness.  See Exhibit 12 at 2.

33.   At the time of his discharge from the Infirmary on December 2, 2002, Kealoha's right upper arm was healing well with no signs or symptoms of inflammation or infection.  See Exhibit

---

[9]/(...continued)
testimony at trial credibly explains that the injury being treated from November 25 to December 2, 2002 was an infected fresh tattoo, not a burn.  Moreover, even without Dr. Bauman's testimony, the medical records demonstrate that the injury was an infected fresh tattoo, as opposed to a burn.

144 at HCF1003, HCF1005.

34.  Upon discharge from the Infirmary, Kealoha was assigned to High Module A.

35.  Sometime between his discharge from the Infirmary on December 2, 2002 and December 5, 2002 at 1pm, Kealoha suffered a burn on his right upper arm.  Kealoha did not have the burn at the time of his discharge from the Infirmary.

36.  On December 5, 2002 at 1pm, Kealoha submitted an Inmate Injury Report, complaining that on November 25, 2002, he was assaulted by another inmate with a lit toilet paper roll and his right upper arm was burned.  <u>See</u> Exhibit 7.  At trial, Kealoha testified that the November 25 date was inaccurate, and that the assault actually took place on November 24, 2002; Kealoha testified that it was two USO Family gang members housed in Medium Module 1A that assaulted him.[10/]  For the reasons described <u>supra</u> and <u>infra</u> with respect to the medical records from November 25 to December 2, 2002, the Court finds Kealoha's testimony regarding the date of and events surrounding his burn to be incredible.  No physical evidence of a burn injury, or an

---

[10/]According to Kealoha, the two inmates who assaulted him were Gilbert Rivera and Eddie Leiato - the two members of the USO Family gang that were housed in Medium Module 1A, Quad 4 on November 24, 2002.  In early December 2002, shortly after Kealoha was reassigned to High Module A, Rivera was also reassigned to High Module A.  It is unclear why Rivera was transferred to High Module A, but it could have been for any number of reasons unrelated to Kealoha.

13

assault, prior to December 5, 2002 was introduced at trial.

37.   In addition to being contradicted by the medical records and testimony of Dr. Bauman, the Court finds Kealoha's testimony regarding the alleged assault to be incredible because, as described in Finding of Fact ¶ 32, Kealoha has changed his story since reporting the alleged assault.  Moreover, on the day of the alleged assault, Kealoha denied that he was assaulted. Over a week later when he reported the alleged assault, Kealoha asked the nurse how much money he could get for the injury. Additionally, Kealoha's story is at least slightly undermined by his repeated requests after the alleged assault to be transferred to a prison facility in Diamondback, Oklahoma, which (as testified to by Sgt. Fields and Deputy Warden Tanaka) has a heavy population of USO Family gang members.  <u>See</u> Exhibits 22-23, 25-27, 29-30.

38.   P. Smith was the examining nurse who filled out the Inmate Injury Report for Kealoha on December 5, 2002.  <u>See</u> Exhibit 7.  As indicated in the report, on December 5, 2002, the burn was clean, with serous drainage, mild swelling, and pain, but was not infected.  The drainage and swelling are consistent with a new injury occurring between December 2 and 5, since by the time of his discharge from the Infirmary on December 2, Kealoha's infected tattoo was healing well, so that it was no longer draining or inflamed.  <u>See</u> Exhibit 144 at HCF1003,

HCF1005.

39.   As documented on the photographs taken at the time of the report, the burn area was approximately 12 x 7 centimeters in size.  <u>See</u> Exhibit 8.  The large burn area is consistent with a new injury occurring between December 2 and 5, since the injury being treated at the Infirmary between November 25 and December 2 was not one large area, but was various lesions.  <u>See</u> Exhibit 144 at HCF009-HCF00100.

40.   On December 5, 2002, Smith gave Kealoha Bacitracin and dressing material for the burn.  Smith noted in the report that Kealoha asked "How much you think I could get for this?"  <u>See</u> Exhibit 7.

41.   On December 13, 2002, Kealoha was treated by a nurse for the same burn on his right upper arm.  At that time, the burn area was covered in a yellowish material.  Kealoha was treated with antibiotics and Silvadene.

42.   At the time of trial in April 2007, the burn scar on Kealoha's right upper arm covered a large portion of the "O" in the tattoo on his right upper arm that previously read "USO".

**II.   Conclusions of Law**

**A.   No Cruel and Unusual Punishment**

1.   The treatment an inmate receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment to the U.S. Constitution, which

prohibits "cruel and unusual punishments."  <u>Farmer v. Brennan</u>,
511 U.S. 825, 832 (1994).

2.   Article 1, Section 12 of the Hawaii Constitution
contains a nearly identical "cruel and unusual punishments"
provision that was modeled after the Eighth Amendment provision.
Hawaii courts have held that when a plaintiff asserts both a
federal and state constitutional claim and the two clauses are
virtually identical, federal law will be followed.  <u>See, e.g.,</u>
<u>Wilder v. Tanouye</u>, 7 Haw. App. 247, 254, 753 P.2d 816, 822 (Haw.
App. 1988) (federal case law followed in determining state prison
inmate's due process of law claim when he relied on the due
process clause of the Hawaii Constitution rather than the United
States Constitution).  Therefore, the holding of this Court with
respect to Plaintiff's claims of cruel and unusual punishment, as
set forth <u>infra</u>, applies equally to the federal and state
constitutional claims.

3.   The Eighth Amendment requires prison officials to,
among other things, take reasonable measures to guarantee the
safety of inmates (including protecting them from violence at the
hands of other inmates) and ensure that inmates receive adequate
medical care.  <u>Farmer</u>, 511 U.S. at 832-33.

4.   A prison official violates the Eighth Amendment's
protection from cruel and unusual punishment only when two
requirements are met: (1) the deprivation alleged is,

16

objectively, sufficiently serious, and (2) the official is,

subjectively, deliberately indifferent to the inmate's safety or

health.  Id., 511 U.S. at 834.

5.   Kealoha alleges two deprivations of his right to be

free from cruel and unusual punishment by prison officials here:

(1) failure to prevent assault by other inmates in Medium Module

1A and (2) inadequate medical treatment for his injuries.[11]

Assuming the alleged deprivations are sufficiently serious,

Kealoha has failed to prove deliberate indifference.

6.   A prison official acts with deliberate indifference

where "the official knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of the

facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the

inference."  Id., 511 U.S. at 837.  A prison official does not

act with deliberate indifference where he "knew the underlying

facts but believed (albeit unsoundly) that the risk to which the

facts gave rise was insubstantial or nonexistent."  Id. at 844.

7.   With respect to Sgt. Fields' alleged failure to protect

Plaintiff from assault, Sgt. Fields did not know of any excessive

_____

[11]The Section 1983 claim for violation of the Eighth
Amendment is brought against Sgt. Fields in his individual
capacity.  See Order Granting in Part and Denying in part
Defendants' Motion for Summary Judgment (July 20, 2006).  The
claim for violation of Hawaii Constitution Article I, Section 12
is brought against the Department of Public Safety and Sgt.
Fields in his individual capacity.  See id.

risk to Kealoha's safety.  While Sgt. Fields knew that some USO
Family gang members were housed in Module 1A, Sgt. Fields also
knew that Medium Module 1 had few assaults and was a less rough
module than Medium Module 2.  Sgt. Fields thought that Kealoha
would be safe in Module 1A.  Even Kealoha thought that he would
be safe in Module 1A, despite Kealoha's knowledge that it housed
a small number of USO Family gang members.  Indeed, the Court has
found no evidence (other than Kealoha's own incredible testimony)
that Kealoha was assaulted in Medium Module 1A.  Moreover, Sgt.
Fields asked Kealoha if Kealoha wanted to go into protective
custody; Kealoha declined.  In short, Sgt. Fields did not act
with deliberate indifference to Kealoha's safety when he
recommended that Kealoha be housed in Medium Module 1A.[12]

8.   With respect to prison officials' alleged failure to
provide Kealoha with adequate medical treatment, the evidence has
demonstrated that Kealoha did in fact receive adequate medical
care: first, for his infected tattoo beginning November 25th, and
then for his burn beginning December 5th.[13]  Kealoha has not

_____

[12]Nor can Deputy Warden Tanaka be said to have acted with
deliberate indifference in transferring Kealoha to Medium Module
1A.  Tanaka knew that Medium Module 1A had little assault-type
activity and thought that Kealoha would be safe there.

[13]Kealoha apparently refused medical treatment on November
24th because he did not want to make a statement.  However, there
is no evidence that he actually needed medical treatment at that
time.  The Court has found that he did not have a burn on
November 24th; there has been absolutely no evidence (other than
(continued...)

18

proven that officials knew of or disregarded any excessive risk to his health.  Kealoha initially denied he had been assaulted; and he made no injury report until December 5, 2002.  Thus, Kealoha has not shown that prison officials acted with deliberate indifference to his health by failing to provide adequate medical care.

### B.   Fields' Qualified Immunity from Federal Claim

9.   In the alternative, the Court concludes that Sgt. Fields is entitled to qualified immunity from the federal claim.

10.   At the summary judgment stage, the Court held that genuine issues of fact precluded it from determining whether Sgt. Fields is entitled to qualified immunity as to the federal Eighth Amendment claim.  See Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment at 12.  See also Saucier v. Katz, 533 U.S. 194, 2001 (2001) (for qualified immunity to apply to a federal constitutional claim, first, the facts alleged must show that the officer's conduct violated a constitutional right and, second, the right in question must be clearly established in light of the specific context of the case).[14/]

---

[13/](...continued)
Kealoha's self-serving testimony) regarding the condition of his tattoo on that date or whether it had become infected by that time.

[14/]See also Thompson v. Mahre, 110 F.3d 716, 720 (9th Cir. 1997) (concluding that denial of a defense motion for summary judgment on qualified immunity leaves the issue for trial and
(continued...)

11.   Having now concluded that the facts demonstrate that Sgt. Fields did not act with deliberate indifference and that no constitutional violation occurred, the Court now finds that Sgt. Fields is entitled to qualified immunity from the federal claim. See id., 533 U.S. at 201 (if no constitutional right would have been violated, there is no need for further inquiry into immunity); see also Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment at 11-12.

12.   Moreover, even if Kealoha's constitutional rights were violated, Sgt. Fields would be entitled to qualified immunity because it would not have been clear to a reasonable officer that this conduct (of recommending Kealoha's transfer to Medium Module 1A) was unlawful, given that Kealoha declined protective custody and agreed to be moved to Medium Module 1A despite having been informed of the presence of USO Family gang members, and where Medium Module 1A had little assault activity and was generally a less rough module than Medium Module 2).  See Saucier, 533 U.S. at 202.  Even Kealoha thought that he would be safe in Medium Module 1A.  See Exhibit 4.

**C.   Fields' Qualified Immunity from State Constitutional Claim**

13.   In the alternative, the Court concludes that Sgt. Fields is entitled to qualified immunity from the state

---

[14]/(...continued)
does not destroy the defense).

constitutional claim.

14.   At the summary judgment stage, the Court held that a genuine issue of fact as to whether Sgt. Fields acted with malice precluded it from determining whether Sgt. Fields is entitled to qualified immunity (also called qualified privilege) as to the state constitutional claim.   <u>See</u> Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment at 12-15. <u>See also</u> <u>Towse v. State of Hawaii</u>, 64 Haw. 624, 631, 647 P.2d 696, 702 (Haw. 1982) (under Hawaii law, a government official performing a public duty enjoys the protection of a qualified privilege unless the official was motivated by malice and not an otherwise proper purpose).

15.   Kealoha has made absolutely no showing that Sgt. Fields acted with malice.   To the contrary, the Court has found that when Sgt. Fields recommended Kealoha's transfer to Medium Module 1A, Sgt. Fields was acting in the interest of protecting Kealoha from harm.   Accordingly, the Court concludes that Sgt. Fields is entitled to qualified immunity from the state constitutional claim.

**D.   No Negligence**

16.   Defendants, by reason of the special relationship created by the custody of the prisoner, are under a duty to Kealoha to take reasonable action to protect him against unreasonable risk of physical harm.   <u>Haworth v. State of Hawaii</u>,

21

60 Haw. 557, 563, 592 P.2d 820, 824 (Haw. 1979).

17.   This duty arises under tort principles of negligence. Id., 60 Haw. at 565.  Thus, "[a]n act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person." Id. (quoting Restatement (Second) of Torts § 302A).

18.   Stated another way, "[w]hen custodial authorities are charged with knowledge that the prisoner may incur harm unless preclusive measures are taken, reasonable care must be exercised to prevent such harm."  Id., 60 Haw. at 564.

19.   Kealoha has alleged that DPS and Sgt. Fields did not act with reasonable care when they assigned him (or, in the case of Fields, recommended the assignment) to Medium Module 1A, because they knew or should have known that Kealoha would likely be assaulted there.

20.   The Court concludes that DPS and Sgt. Fields took reasonable care to prevent harm to Kealoha.  They knew that Kealoha was at risk of assault if he was returned to Medium Module 2.  Instead of returning him to that module, they assigned him to Medium Module 1A, which was a less violent module. Although Sgt. Fields knew that two USO Family gang members were assigned to Medium Module 1A, Quad 4, it was reasonable for Fields to recommend Kealoha for housing there because it was a

22

non-violent module where Fields (and Kealoha) thought that
Kealoha would be safe.  Kealoha himself even requested to be
transferred to Medium Module 1A because Kealoha said that he
would feel safe there since he was "in with" the Mafia USO.

21.  Kealoha's claim for negligence fails because Defendants
took reasonable care to prevent harm to Kealoha.

**E.   Qualified Immunity from Negligence Claim**

22.  In the alternative, the Court concludes that Sgt.
Fields is entitled to qualified immunity from the negligence
claim.

23.  At the summary judgment stage, the Court held that a
genuine issue of fact as to whether Sgt. Fields acted with malice
precluded it from determining whether Sgt. Fields is entitled to
qualified immunity as to the negligence claim.  See Order
Granting in Part and Denying in Part Defendants' Motion for
Summary Judgment at 12-15.  See also Towse, 64 Haw. 624, 631
(under Hawaii law, a government official performing a public duty
enjoys the protection of a qualified privilege unless the
official was motivated by malice and not an otherwise proper
purpose).

24.  As discussed supra, Kealoha has made absolutely no
showing that Sgt. Fields acted with malice.  To the contrary, the
Court has found that when Sgt. Fields recommended Kealoha's
transfer to Medium Module 1A, Sgt. Fields was acting in the

23

interest of protecting Kealoha from harm.   Accordingly, the Court concludes that Sgt. Fields is entitled to qualified immunity from the state negligence claim.

## III. Decision

Plaintiff has failed to prove his claims by a preponderance of the evidence.   Defendants are entitled to judgment on all counts.

The Court declines to grant Plaintiff's counsel's request to transfer Plaintiff to the Honolulu Federal Detention Center, in view of this Court's findings and conclusions, its decision that Plaintiff failed to prove his claims, Plaintiff's failure to plead for such relief, and in any event, questions raised as to this Court's jurisdiction for such relief.   Should Plaintiff wish to pursue such relief, he should file a separate action.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 2, 2007.



_____
Alan C. Kay
Sr. United States District Judge


Kealoha v. Dept. of Public Safety, et al., Civ. No. 05-00009 ACK-KSC, Findings of Fact, Conclusions of Law, and Decision.